**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| RHONDA L. HUTTON, O.D. et al., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL BOARD OF EXAMINERS IN OPTOMETRY, INC. <br><br> Defendant. | CASE NO. 1:16-CV-03025-JKB |

**UNOPPOSED MOTION TO PERMIT ISSUANCE OF CLASS NOTICE OF PROPOSED CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT THEREOF**

Dated:  March 4, 2019

| | |
|---|---|
| | Respectfully submitted, |
| Michael Liskow (*pro hac vice*) <br> The Sultzer Law Group P.C. <br> 351 W. 54th St., Suite 1C <br> New York, New York 10019 <br> liskowm@thesultzerlawgroup.com <br> Telephone: (212) 969-7811 <br> Fax: (888) 749-7747 <br><br> Hassan Zavareei      No. 18489 <br> TYCKO & ZAVAREEI LLP <br> 1828 L. Street, NW, Suite 1000 <br> Washington, DC 20036 <br> hzavareei@tzlegal.com <br> Tel:  (202) 973-0910 <br> Fax:  (202) 973-0950 | By:s/ Norman E. Siegel_____ <br> Norman E. Siegel (*pro hac vice*) <br> Barrett J. Vahle (*pro hac vice*) <br> J. Austin Moore (*pro hac vice*) <br> STUEVE SIEGEL HANSON LLP <br> 460 Nichols Road, Suite 200 <br> Kansas City MO 64112 <br> siegel@stuevesiegel.com <br> vahle@stuevesiegel.com <br> moore@stuevesiegel.com <br> Tel:    (816) 714-7100 <br> Fax:   (816) 714-7101 |

*Counsel for Plaintiffs and the Class*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF THE LITIGATION .................................................................... 3

  A.    PROCEDURAL HISTORY ...................................................................................... 3

  B.    CASE INVESTIGATION AND CLIENT INTAKE ................................................. 6

  C.    SETTLEMENT NEGOTIATIONS ............................................................................ 7

III.    SUMMARY OF SETTLEMENT ......................................................................... 7

  A.    THE SETTLEMENT CLASS ................................................................................... 7

  B.    THE SETTLEMENT BENEFITS ............................................................................. 8

    1.  Cash Settlement Fund ................................................................................. 8

      a.  Reimbursement for Attested Time ............................................................ 8

      b.  Reimbursement of Out-of-Pocket Losses................................................. 9

      c.  Three-Bureau Credit Monitoring Services ............................................. 10

      d.  Identity Restoration Services................................................................... 12

      e.  Attorneys' Fees, Costs, and Expenses and Service Awards.................... 12

      f.  Expenses for Settlement Administration ................................................. 13

      g.  The Settlement Fund is Non-Reversionary ............................................. 13

    2.  Business Practice Changes........................................................................ 14

  C.    PROPOSED NOTICE AND CLAIMS PROCESS ......................................................... 16

  D.    PROPOSED RELEASES ......................................................................................... 17

IV.     ISSUING NOTICE TO THE CLASS IS JUSTIFIED......................................... 17

  A.    STANDARD FOR ISSUANCE OF NOTICE .............................................................. 17

    1.  The Class Representatives and Class Counsel Have Adequately Represented the
        Class......................................................................................................... 19

    2.  The Settlement was Negotiated at Arm's Length. .................................... 21

    3.  The Relief Provided for the Class is More Than Adequate. ..................... 22

      a.  The cost, risks, and delay of trial and appeal. ....................................... 22

      b.  The effectiveness of the proposed method of distributing relief to the class,
          including the method of processing class member claims. ..................... 25

      c.  The terms of the proposed attorneys' fee award and reimbursement of
          expenses, including the timing of payment. ........................................... 25

i

d.      There is no agreement required to be identified under Rule 23(e)(3). ................... 28

4.      The Settlement Treats Class Members Equitably Relative to Each Other. ............... 28

B.   THE SETTLEMENT CLASS MEETS THE REQUIREMENTS FOR CERTIFICATION FOR PURPOSES OF SETTLEMENT. ............................................................... 28

1.      Rule 23(a) is satisfied ............................................................... 29

a.      Numerosity is satisfied. ......................................................... 29

b.      Commonality, Typicality, and Adequacy are satisfied. ......................................... 29

2.      Rule 23(b)(3) is satisfied ............................................................ 31

a.      Predominance is satisfied. ....................................................... 32

b.      Superiority is satisfied. ........................................................ 33

V.      THE COURT SHOULD APPOINT NORMAN E. SIEGEL AND AUSTIN MOORE OF STUEVE SIEGEL HANSON LLP AS INTERIM CLASS COUNSEL. ................... 34

VI.      THE NOTICE SATISFIES RULE 23 AND DUE PROCESS REQUIREMENTS. ........ 34

VII.      THE COURT SHOULD APPOINT HEFFLER CLAIMS GROUP AS SETTLEMENT ADMINISTRATOR .................................................................. 35

VIII.      PROPOSED TIMELINE OF EVENTS ........................................................ 35

IX.      CONCLUSION .................................................................................. 35

CERTIFICATE OF SERVICE ................................................................. 36

# TABLE OF AUTHORITIES

Cases

*Amaya v. DGS Constr., LLC*, 326 F.R.D. 439 (D. Md. 2018) ...................................................... 31

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... 29, 31

*Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015) ...................................................................... 17

*Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451 (D. Md. 2014) .......................... 26, 27, 28, 29

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) ................................................................. 30

*Chado v. Nat'l Auto Inspections. LLC*,
   No. CV ADC-17-2945, 2018 WL 3420018 (D. Md. July 13, 2018) ................................. 29, 30

*Decohen v. Abbasi, LLC*, 299 F.R.D. 469 (D. Md. 2014) .................................................. passim

*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003) ............................................ 29

*Hammond v. The Bank of N.Y. Mellon Corp.*,
   No. 08 Civ. 6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ............................................ 23

*Hapka v. CareCentrix, Inc.*,
   No. 2:16-CV-02372-KGG, 2018 WL 1871449 (D. Kan. Feb. 15, 2018) .......................... 31, 32

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613 (4th Cir. 2018) .............. 5, 30

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018) ............................. 31, 32

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
   293 F.R.D. 21 (D. Me. 2013) ............................................................................................. 23, 24

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................................. 31, 32

*In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991) .......................................................... 18

*In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379 (D. Md. 1983) ................................... 17

*In re Serzone Prod. Liab. Litig.*, 231 F.R.D. 221 (S.D.W. Va. 2005) ......................................... 33

*In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968 (8th Cir. 2018) ................. 16

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
   No. 1:14-MD-02583-TWT, 2016 WL 11299474 (N.D. Ga. Aug. 23, 2016) .............. 19, 20, 22

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
No. 1:14-MD-02583-TWT, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) ...................... 31, 32

*In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246 (E.D. Va. 2009) .............................................. 27

*Jernigan v. Protas, Spivok & Collins, LLC*,
No. CV ELH-16-03058, 2017 WL 4176217 (D. Md. Sept. 20, 2017) .................................... 26

*Jones v. Dominion Res. Servs.*, Inc., 601 F. Supp. 2d 756 (S.D.W. Va. 2009) ........................... 26

*Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665 (D. Md. 2013).................................... 27

*Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757 (D. Md. 2012) ................................ 30

*U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) ................................................................ 26

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................ 30

Rules

Fed. R. Civ. P. 23 ....................................................................................................................passism

Fed. R. Civ. P. 12 ...................................................................................................................... 4, 5, 6

Other Authorities

1 Newberg on Class Actions § 3:12............................................................................................ 29

Manual for Complex Litigation, § 14.121 ................................................................................. 26

# I.      INTRODUCTION

During the summer of 2016, large numbers of optometrists from around the country began experiencing identity theft. In particular, they learned that Chase Amazon Visa credit cards were being applied for in their names using their Social Security numbers. They started discussing the issue through Facebook groups formed for the purpose of identifying the source of the apparent data breach and soon realized they were all victims of the same type of fraud, and all within a few days of one another. The optometrists soon concluded that the only common source amongst them, and to which they had all given their personal information that included Social Security numbers and dates of birth (information necessary to apply for new lines of credit, among other things), was the National Board of Examiners in Optometry ("NBEO"). NBEO is a non-profit 501(c)(3) organization, with a stated mission "to protect the public by accurately assessing the competence of practicing optometrists."[1] Every optometry student must submit their personal information to NBEO to sit for certifying exams, and NBEO retains enrollment data to allow for the credentialing of optometrists that move from state-to-state.

The fraud perpetrated on the optometry community has been ongoing, with optometrists continuing to be notified of fraudulent Chase Amazon Visa card applications, as well as numerous and varied other forms of fraud, such as medical and tax return fraud, and fraudulent debit and credit cards being applied for in their names and Social Security numbers, using the same information they used to register for exams with NBEO.

After the data breach, thirteen optometrists filed three separate actions against NBEO in this Court, seeking damages, statutory penalties, and injunctive relief on behalf of themselves and their fellow optometrists. After significant investigation, litigation, and lengthy arm's-length settlement negotiations, the Parties have agreed on a classwide settlement to resolve these cases

---

[1] https://www.optometry.org/president.cfm.

(the "Settlement"), including the following key provisions: NBEO will establish a cash settlement fund of $3,250,000 that will be used to pay for (1) reimbursement of class members' claimed time spent remedying issues related to the alleged data breach, up to $1,000 per individual; (2) reimbursement of class members' documented out-of-pocket losses fairly traceable to the alleged data breach, up to $7,500 per individual; (3) three years of three-bureau credit monitoring through Identity Guard (retailing at nearly $720 per individual) for all class members who sign up, which includes up to $1 million dollars in reimbursement insurance covering losses due to identity theft or fraud; (4) access to identity restoration services for all class members, including professional fraud resolution assistance to help with identity recovery and restoration, in case the class member experiences identity theft or fraud in the three years following the Effective Date of the Settlement; (5) the costs of notice and settlement administration; (6) any award for attorneys' fee and expenses, as approved by the Court; and (7) any award for service awards to the class representatives, as approved by the Court.[2] In addition, NBEO has agreed to upgrade its data security practices, including retaining an independent security firm to conduct a written risk assessment of NBEO's data security, encrypting exam-takers' personal information, and no longer storing full nine-digit Social Security numbers in its electronic databases.

The first step in effectuating the terms of the Settlement is to issue notice to the class. Pursuant to Rule 23(e)(1)(B), directing notice to the class is justified where the Court concludes it will likely be able to (1) approve the Settlement as fair, reasonable, and adequate, and (2)

---

[2] Pursuant to the Settlement Agreement, the "Net Settlement Fund" means the amount of funds available to pay out claims for out-of-pocket losses and attested time after funds are allocated from the Settlement Fund for payment of the following: (i) Administrative Expenses; (ii) Taxes and Tax-Related Expenses; (iii) expenses associated with procuring Credit Monitoring Services; (iv) Service Awards Payments approved by the Court; and (v) Fee Award and Costs approved by the Court, as those terms are defined in the Agreement. *See* Agreement, ¶ 17.

certify the class for purposes of judgment on the Settlement. Accordingly, pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs request that the Court permit the issuance of notice to the class of the proposed settlement, approve the form and manner of notice to the class, appoint Heffler Claims Group to administer the class notice plan and to fulfill the duties of the Settlement Administrator as outlined in the Agreement, and schedule a fairness hearing to determine whether the Settlement should be finally approved.

In support of the pending motion, Plaintiffs submit, along with this memorandum, the Settlement Agreement with accompanying exhibits (including the proposed class notice and claim form) ("Agreement") as Exhibit A hereto; the Declaration of Norman E. Siegel ("Siegel Decl.") as Exhibit B; the Declaration of Mark P. Rapazzini on Heffler Claims Group Qualifications and Proposed Notice Program ("Heffler Decl.") as Exhibit C; the Declaration of Jerry Thompson of Identity Guard ("IG Decl.") as Exhibit D; and a Proposed Order at Exhibit E.

## II.    SUMMARY OF THE LITIGATION

### A.    PROCEDURAL HISTORY

On or around July 23, 2016, optometrists from around the country began to notice that fraudulent Chase Amazon Visa credit cards were being applied for or opened in their names using their Social Security numbers. They started discussing the fraud through Facebook groups formed for the purpose of identifying the source of what seemed to be a data breach and soon realized they were all victims of the same type of fraud. The optometrists soon concluded that the only common source amongst them and to which they had all given their personal information, including Social Security numbers and dates of birth, was NBEO, where every optometry student must submit their personal information, including Social Security numbers, to register for required board-certifying exams. The breach has affected recent exam-registrants and those that submitted their personal information to NBEO even more than 30 years ago. Many

victims provided NBEO with unique information that was not provided to any other entity, and it was this information that fraudsters used to commit identity theft.[3]

After the initial round of Chase Amazon Visa card fraud, the fraud perpetrated on the optometry community expanded to multiple other forms of fraud. In particular, while optometrists are continuing to this day to learn that Chase Amazon Visa cards are being applied for in their names, many have also learned that other accounts are being fraudulently applied for or opened in their names, including GreenDot debit cards, PayPal business accounts, Synchrony Bank cards, and Discover cards using personal information contained in NBEO's data systems (and for many optometrists, *only* in NBEO's data systems). Some have also had fraudulent tax returns filed in their names, fraudulent charges made on existing credit cards, and their identities stolen to obtain medical care.

On August 30, 2016, Plaintiffs Rhonda L. Hutton, O.D., and Tawny P. Kaeochinda, O.D., on behalf of themselves and all others similarly situated, filed a complaint in this Court alleging they had been victims of identity fraud after their personal information was compromised in a breach of NBEO's data systems. ECF No. 1. On September 17, 2016, Plaintiff Nicole Mizrahi, O.D., on behalf of herself and all others similarly situated, filed a complaint in this Court making the same allegations. Case No. 16-3146 ("*Mizrahi*"), ECF No. 1.[4] On October 22, 2016, NBEO

---

[3] NBEO disputes that it was the source of the breach and that class members were harmed through any of its actions or inactions. NBEO also disputes that NBEO is the only entity that is in possession of the class members' information. Finally, NBEO contends that the Chase Amazon VISA fraud was wide-spread and not simply limited to the optometry community. NBEO nevertheless supports the Settlement and therefore has no opposition to this motion.

[4] The *Hutton* case was filed by Hassan Zavareei of Tycko & Zavareei LLP and Norman E. Siegel, Barrett J. Vahle, and Austin Moore of Stueve Siegel Hanson LLP. The *Mizrahi* action was filed by Michael Liskow of The Sultzer Law Group P.C. (formerly of Wolf Haldenstein Adler Freeman & Herz LLP). Throughout the litigation, counsel for *Hutton* and *Mizrahi* have sought to work cooperatively with each other to ease the burden on the Parties and the Court. Siegel Decl., ¶ 9. These attorneys are collectively referred to herein as "Plaintiffs' Counsel."

moved to dismiss all the claims in both cases under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, to strike some of the allegations pursuant to Rules 12(f) and 23(d)(1)(D), and on November 2, 2016, it moved to consolidate those cases. ECF Nos. 11, 12; *Mizrahi*, ECF Nos. 9, 10. On March 22, 2017, this Court granted NBEO's motion to dismiss pursuant to Rule 12(b)(1) for lack of standing, and denied as moot the motions to consolidate and the pending motions to dismiss and to strike to the extent they were premised on other rules. ECF No. 19. On April 19, 2017, Plaintiffs appealed that decision to the Fourth Circuit Court of Appeals. *See* Appeal Nos. 17-1506 and 17-1508.

On July 14, 2017, Plaintiffs Brenda Liang, O.D., Jessica Olendorff, O.D., Kristine Fergason, O.D., Julie Wolf, O.D., Camilla Dunn, O.D., Mark Garin, O.D., Natalie West, O.D., Andrea Robinson, O.D., Priscilla Pappas-Walker, O.D., and Lauren Nelson, O.D., on behalf of themselves and all others similarly situated, filed a complaint in this Court making the same allegations against NBEO, with additional factual support and details supporting their claims. Case No. 17-1964 ("*Liang*"), ECF No. 1. On September 7, 2017, NBEO again moved to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) and 12(b)(6). *Id.*, ECF No. 25. Following briefing, on December 18, 2017, this Court stayed *Liang* pending the resolution of the Fourth Circuit appeal, concluding the outcome of that appeal would govern further proceedings in that case. *Id.*, ECF No. 36. On June 12, 2018, the Fourth Circuit issued an opinion vacating and remanding this Court's order dismissing the *Hutton* and *Mizrahi* cases for lack of standing. The Court of Appeals concluded the Plaintiffs had sufficiently alleged injury in fact that was fairly traceable to NBEO for the purposes of Article III standing. *See* Appeal No. 17-1506, Doc. 33; *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 616 (4th Cir. 2018). The Court of Appeals issued its mandate on July 5, 2018. *See* Appeal No. 17-1506, Doc. 35.

On July 13, 2018, the Court lifted the stay in the *Liang* matter, ECF No. 38, and on September 28, 2018, the Court entered its order denying NBEO's motion to dismiss the *Liang* complaint pursuant to Rules 12(b)(1) and (b)(6). ECF No. 40. On October 3, 2018, the Court likewise denied NBEO's motions to dismiss the *Hutton* and *Mizrahi* complaints under 12(b)(6) and its alternative motion to strike certain allegations. ECF No. 31. On November 12 and 15, 2018, NBEO filed its Answers to Plaintiffs' Complaints. ECF No. 38; *Liang*, ECF No. 43; *Mizrahi*, ECF No. 33. On November 30, 2018, this Court consolidated *Hutton*, *Liang*, and *Mizrahi* under case number 16-3025. ECF No. 40. On December 18, 2018, this Court entered the Scheduling Order that would govern the consolidated proceedings and the Parties initiated the discovery process.

### B.   CASE INVESTIGATION AND CLIENT INTAKE

On August 19, 2016, Plaintiffs' Counsel received their first call from an optometrist complaining that a Chase Amazon Visa card had been fraudulently opened in her name using her Social Security number. She said the fraudsters used her maiden name and an outdated address she resided at in optometry school. She believed the only organization with this information was NBEO. She also said she had been in contact with many other optometrists who had also recently experienced Chase Amazon Visa card fraud, as well as other types of fraud. She said it appeared the first round of fraud started in late July. Siegel Decl., ¶ 19. Plaintiffs' Counsel has since communicated with over 250 optometrists from 41 states, who have each relayed similar experiences. *Id.* at ¶ 20. Plaintiffs' Counsel has investigated each of their circumstances, including reviewing the information used by fraudsters to commit the fraud, the information the optometrists used to register for exams with NBEO, the forms of fraud being committed, and whether they had been victims of any other data breaches. Counsel prepared detailed case intake forms for each of them, creating a repository of detailed information about the data breach and

its effects. *Id.* Plaintiffs' Counsel has also monitored activity in the Facebook group formed by Plaintiff Nelson as a means for the optometry community to discuss the breach and how to best deal with its fraudulent effects. That group currently has over 4,700 members. For over two years, Counsel have provided periodic detailed updates to their clients and other class members about the status of litigation. *Id.*

### C. SETTLEMENT NEGOTIATIONS

Following the Fourth Circuit's decision, the Parties began discussion of potential resolution of this case. On October 8, 2018, the Parties participated in a full-day mediation in Baltimore, Maryland before a mediator experienced in complex litigation, Cathy Yanni of JAMS ADR. Although the Parties were not able to reach an agreement at that session, they continued to engage in settlement discussions through Ms. Yanni and directly between counsel, including negotiating a Memorandum of Understanding containing the essential terms of a settlement. *Id.* at ¶ 21. During this period, the Parties exchanged preliminary discovery about the size and scope of the class, possible business practices changes by NBEO, the merits of Plaintiffs' claims, and potential mechanisms to mitigate future harm, including evaluating multiple purveyors of credit monitoring services to determine the best product. *Id.* On January 16, 2019, the Parties participated in a second in-person mediation before Ms. Yanni in Chicago, this time agreeing to the essential terms of a settlement in principle, including accepting the mediator's proposal of the $3.25 million cash fund, memorialized by a Memorandum of Understanding. On February 28, 2019, the Parties entered into the proposed Settlement that is now before this Court. *Id.*

## III. SUMMARY OF SETTLEMENT

### A. THE SETTLEMENT CLASS

The Parties' proposed settlement will provide benefits to all members of the following Settlement Class:

All individuals who had their Personal Information[5] stored on NBEO's systems prior to or as of November 15, 2018.[6]

Agreement, ¶ 33. According to NBEO's records, the Settlement Class consists of 61,014 individuals. *See* Siegel Decl., ¶ 7.

## B.   THE SETTLEMENT BENEFITS

### 1.   Cash Settlement Fund

NBEO has agreed to fund a non-reversionary cash settlement fund in the amount of $3,250,000. The Settlement Fund will be used to pay for the following benefits to the Settlement Class:

### a.   Reimbursement for Attested Time

The first component of the Settlement is reimbursement for time spent remedying issues related to the data breach. *See* Agreement, ¶ 49. Settlement Class Members can make a claim for reimbursement for up to 40 hours at $25 per hour, subject to a total individual cap when combined with Out-of-Pocket Losses of $7,500. To obtain Reimbursement for Attested Time of up to 20 hours, class members need only attest to the time spent and briefly describe the actions taken. Claims for Reimbursement for Attested Time of more than 20 hours require only an attestation and documentation, including self-prepared documents, or a detailed description showing how the time was expended and why it was necessary. Siegel Decl., ¶ 23. To the best of Plaintiffs' Counsel's knowledge, the amount recoverable under this Settlement for time spent remedying issues is more than any other data breach settlement in history, and is a significant

---

[5] "Personal Information" is defined in paragraph 25 of the Agreement as an individual's name combined with his or her nine-digit Social Security number.

[6] Excluded from the Settlement Class are: (i) NBEO; (ii) any entity in which NBEO has a controlling interest; (iii) NBEO's officers, directors, legal representatives, successors, subsidiaries, and assigns; (iv) any judge, justice, or judicial officer presiding over the Actions and the members of their immediate families and judicial staff; and (v) any individual who timely and validly opts-out from the Settlement Class. Agreement, ¶ 33.

benefit, especially to those class members who were forced to take time out of their busy professional lives to address issues stemming from the alleged breach. *Id.* at ¶ 39.

### b.      Reimbursement of Out-of-Pocket Losses

The second component of the Settlement is reimbursement of out-of-pocket losses and unreimbursed charges fairly traceable to the data breach up to $7,500 per individual ("Out-of-Pocket Losses"). *See* Agreement, ¶¶ 47-48. The "fairly traceable" standard will allow class members to be compensated for a broad range of harm likely to flow from the data breach. *See* Siegel Decl., ¶ 22. Examples of Out-of-Pocket Losses that are eligible for reimbursement through the Settlement include:

- Unreimbursed costs associated with fraud or identity theft;

- Professional fees including attorneys' fees, accountants' fees and fees for credit repair services;

- Miscellaneous expenses such as notary, fax, postage, copying, mileage, and long-distance telephone charges;

- Costs of credit monitoring or other identity theft protection services incurred after June 1, 2016;

- Costs associated with freezing or unfreezing credit with any credit reporting agency.

*See* Exhibit 2 to Agreement, Claim Form.

The documentation necessary to establish Out-of-Pocket Losses is not overly burdensome and can consist of documents such as receipts from third parties, highlighted account statements, phone bills, gas receipts, and postage receipts, among other relevant documentation. *See id.*; Siegel Decl., ¶ 23. If the claim is rejected for any reason, there is also a consumer-friendly appeals process whereby claimants will have the opportunity to cure any deficiencies in their submission or request an appeal if the Settlement Administrator determines a claim for Out-of-Pocket Losses is deficient in whole or part. *See id.*; Agreement, ¶¶ 51-52.

### c.     Three-Bureau Credit Monitoring Services

The Settlement will also make available to all class members three-bureau credit monitoring. Agreement, ¶ 66. Credit monitoring is a service that monitors an individual's credit reports and alerts the individual when any change is made that could signal fraudulent activity. Siegel Decl., ¶¶ 29-30. Credit changes can include new credit card or loan applications, new credit inquiries, existing account changes, and new public records or address changes, among others. *See id*. at ¶ 30. Credit monitoring gives the individual the opportunity to confirm the accuracy of a credit change in real time and, if necessary, address the issue before fraud occurs or expands. *Id.* There are three major credit reporting agencies in the U.S. – Experian, Equifax and TransUnion. While many credit monitoring services only monitor an individual's credit activity with one agency, the more robust services monitor activity from all three major credit reporting agencies. This is important because each agency operates independently from one another, and the information they receive from creditors can be different. As such, utilizing a credit monitoring services that monitors an individual's reports with all three agencies ensures that there are no major gaps in coverage. *Id.* Accordingly, the Parties have made available to all class members a robust monitoring service through Identity Guard's IG Total Plan ("Credit Monitoring Services), which retails for $19.99 per month.[7] IG Decl., ¶ 7. The Credit Monitoring Services are available to all class members regardless of whether they submit a claim for Out-of-Pocket Losses or Attested Time and include the following features:

- Three-bureau credit monitoring providing notice of changes to the consumer's credit profile with Equifax, Experian, and TransUnion;

- Up to $1 million dollars reimbursement insurance from AIG covering losses due to identity theft or fraud;

---

[7] https://www.identityguard.com/plans/total.html

- Real time instant authentication alerts when someone attempts to make a change to the consumer's personal account information within Identity Guard's network;

- LexisNexis Authentication Alerts utilizing LexisNexis' database of legal, governmental and newsworthy incidents (for example, the system searches payday-loan providers and court records, and also monitors the top ten largest U.S. financial institutions, for attempted or actual fraudulent use of the user's information);

- Dark Web Monitoring providing notification if the consumer's information such as Social Security number, credit card numbers, financial account numbers, and health insurance number are found on the Dark Web;

- Threat Alerts powered by IBM "Watson" providing proactive alerts about potential threats relevant to the consumer found by IBM Watson's artificial intelligence, for instance: breaches, phishing scams, and malware vulnerabilities;

- Customer support and victim assistance provided by Identity Guard;

- Anti-phishing and safe Apps for iOS & Android Mobile devices; and

- Safe browsing software for PC & Mac to help protect the consumer's computer against malicious content.

Siegel Decl., ¶ 29; IG Decl., ¶ 7.

The Credit Monitoring Services provide significant value to the class. While the Parties were able to secure discounted pricing based on the size of the class, the actual market value of this settlement benefit can fairly be estimated at approximately $720 per class member ($19.99 per class member for 36 months), or almost $44 million in services made available to the class as a whole. Siegel Decl., ¶ 29. Class members will be encouraged to sign up for Credit Monitoring Services, which are available to every class member regardless of harm experienced to date. Class members will be able to claim the services easily—they can submit and return their Claim Form by U.S. Mail electing to enroll in these services, or submit their Claim Form online at the settlement website maintained by the Settlement Administrator. Heffler Decl., ¶ 4.

### d.    Identity Restoration Services

The fourth component of the Settlement is identity restoration services. Agreement, ¶ 67. All Settlement Class Members, even those who do not enroll in Credit Monitoring Services or otherwise submit a claim, will be entitled to utilize identity restoration services through Identity Guard by referencing an engagement code ("Identity Restoration Services"). This coverage provides class members with access to fraud resolution specialists who can assist with important tasks such as placing fraud alerts with the credit bureaus, disputing inaccurate information on credit reports, scheduling calls with creditors and other service providers, and working with law enforcement and government agencies to dispute fraudulent information. *See* Siegel Decl., ¶ 31. The Identity Restoration Services will be available for a period of three years from the Effective Date. *Id.*

### e.    Attorneys' Fees, Costs, and Expenses and Service Awards

Pursuant to the Settlement Agreement, the Settlement Fund will be used to pay for any award of attorneys' fees and expenses as approved by the Court. Plaintiffs' Counsel will move for an attorneys' fee award not to exceed thirty percent of the Settlement Fund and for reimbursement of cost and expenses not to exceed $125,000. Agreement, ¶ 98. Plaintiffs will also move for service awards for the thirteen class representatives to be paid from the Settlement Fund in an amount not to exceed $2,000 each, in recognition of the time, effort, and expense they incurred pursing claims against NBEO that ultimately benefited the entire class. *Id.* at ¶ 96. Pursuant Rule 23(h), Plaintiffs' Counsel will file the motion for attorneys' fees, costs, and expenses and for service awards at least 21 days before the Objection Deadline. Agreement, ¶¶ 96, 98; Siegel Decl., ¶ 43.

### f.        Expenses for Settlement Administration

The Settlement Fund will also pay for expenses for administering the Settlement. These include the costs incurred by the Settlement Administrator in providing notice and processing Settlement claims. Agreement, ¶ 45. The estimated cost of the notice and claims administration is between $150,000-160,000. Heffler Decl., ¶ 20.

### g.        The Settlement Fund is Non-Reversionary

Based on the experience of Plaintiffs' Counsel, the funds available in the Net Settlement Fund will be more than adequate to compensate all class members for losses stemming from the alleged breach. Indeed, when a victim incurs out-of-pocket expenses relating to a data breach, the expenses are typically associated with seeking advice about how to address the breach (*e.g.*, paying for professional services), paying incidental costs associated with identity theft or fraud (*e.g.*, overdraft fees or costs for sending documents by certified mail), or taking mitigative measures like paying for credit monitoring or credit freezes. Siegel Decl., ¶ 24. As such, the out-of-pocket expenses associated with a data breach are generally relatively modest, and rarely exceed several hundred dollars. *Id.* When victims spend more than this amount, it is typically due to professional services such as accountant or attorneys' fees. The available research also supports this conclusion. A study conducted by the Ponemon Institute, a company that conducts independent research on privacy, data protection and information security policy, found that in the aftermath of a data breach, 81% of data breach victims do not have any out-of-pocket losses, and for the 19% that do, those losses average to $38 per individual. *Id.* at Ex. 1 at p. 7. In the unlikely event that the aggregate amount of payments for reimbursement of out-of-pocket losses and attested time exceeds the Net Settlement Fund, then claims for out-of-pocket losses will be paid first, with payments for attested time reduced on a *pro rata* basis. Agreement, ¶ 60.

In the more likely event there are remaining funds after the initial claims period, then there will be a second claims period during which class members can seek reimbursement for out-of-pocket losses incurred after the initial claims deadline (the "Tail Period"). *Id.* at ¶ 61. The Tail Period will run for a period of six months after the Claims Deadline. *Id.* at ¶ 39. If payments for claims made during the Tail Period do not exhaust the remaining funds, then any remaining funds shall be distributed evenly to class members who submitted an approved claim for Out-of-Pocket Losses or Attested Time during the Claims Period, subject to the individual aggregate cap of $7,500. *Id.* at ¶ 64. If any funds remain after this process, they will be distributed evenly to class members who enrolled in Credit Monitoring Services but did not submit a claim for Out-of-Pocket Losses or Attested Time. *Id.* at ¶¶ 64-65. This process will ensure that all Settlement funds directly benefit the Settlement Class, and there will be no reversion to NBEO.

### 2.    Business Practice Changes

As an additional important benefit of the Settlement, NBEO has agreed to adopt and implement security practices to help protect the personal information of its exam-takers. This will include at least the following business practices changes for a period of at least three (3) years following the Effective Date, except where otherwise provided:

- **Risk Assessment** – Within forty-five (45) days after the Court grants final settlement approval, NBEO will retain and pay for an independent security firm, which is both certified and accredited for security testing and best practices, to conduct a written risk assessment of NBEO's data security and data retention practices. The written risk assessment shall be conducted applying guidance from the National Institute of Standards and Technology or another comprehensive and defined standard.

- **Safeguard Design Resulting From Risk Assessment** – NBEO will design and implement reasonable safeguards to manage the risks, if any, identified through the risk assessment. Following such implementation, NBEO shall provide to Class Counsel an affidavit confirming that the risk assessment was completed and that NBEO has implemented necessary steps to address the findings of the risk assessment based on the threat levels set forth in the assessment.

- **Third-Party Compliance** – NBEO shall require all third-party vendors engaged for purposes of data storage, retention, or security to adopt the same reasonable safeguards and data security and data retention practices adopted by NBEO.

- **Vulnerability Assessment** – NBEO will implement automated vulnerability scanning tools, including the implementation of an artificial intelligence cyber-defense solution, that cover all systems, regardless of operating system, database, or location, and set policies for prompt remediation of any discovered vulnerabilities.

- **Security Program** – NBEO will evaluate and adjust as reasonably necessary its systems on which exam-takers' personal information is stored in light of: (i) the results of the testing and monitoring required by this Agreement; (ii) any material changes to its operations or business arrangements; or (iii) any other circumstances that it knows or has reason to know may have a material impact on the effectiveness of its security program.

- **Review of Policies and Procedures** – NBEO will periodically review and revise its policies and procedures addressing data security as reasonably necessary.

- **Encryption** – NBEO will encrypt all Personal Information stored in databases maintained by NBEO with certificate-based AES 256 encryption.

- **Social Security Numbers** – In perpetuity, NBEO will no longer store full nine-digit Social Security Numbers in its electronic databases.

- **Purge Historical SSNs** – NBEO will delete and purge all historical exam-takers' full nine-digit Social Security Numbers stored in its electronic databases.

- **Firewall Implementation** – NBEO will place all systems containing exam-takers' personal information behind application firewalls and block unauthorized traffic.

- **Limit Remote Access of NBEO Employees** – NBEO will limit remote access of NBEO employees based on need and job description aside from the system administrators. Remote access may be granted to an employee due to a medical condition or in response to a catastrophic event or emergency requiring NBEO to function off-site.

- **Limit Access Privileges of NBEO Employees** – NBEO will limit access for NBEO employees based on need and job description.

- **Implement Password Policies** – NBEO will verify, and have management attest, that all default passwords are changed to follow password policies that comply with best practices.

- **Employee Education and Training** – NBEO will maintain a program to educate and train its employees on the importance of the privacy and security of exam-takers' personal information. All employees will be required to attend annual in-person security awareness training.

Agreement, ¶ 69.

Because NBEO continues to store exam-takers' information to allow for the transfer of optometrist credentials from one state to another, this relief has value to all class members as it will help protect class members' information going forward. Siegel Decl., ¶ 33. *See also In re Target Corp. Customer Data Sec. Breach Litig*., 892 F.3d 968, 974 n.6 (8th Cir. 2018) ("the injunctive relief offered under the settlement has value to all class members").

### C.   PROPOSED NOTICE AND CLAIMS PROCESS

No later than three (3) business days after the date on which the Court enters the order permitting notice to issue to the class, NBEO will provide the Settlement Administrator with the names, last known mailing address, and last known e-mail addresses of class members. Agreement, ¶¶ 34, 72. Notice will be mailed to all 61,014 class members along with a Claim Form. Heffler Decl., ¶ 6. Additionally, e-mail notification will be sent to all class members for whom e-mail addresses are available. *Id.* The Parties anticipate that this robust notice plan will have a high rate of success in reaching class members, and have retained Heffler Claims Group to serve as the Settlement Administrator, subject to Court approval. Siegel Decl., ¶ 35. Heffler is well-versed in administering class action settlements, including in the data breach context. *See generally* Heffler Decl. The approximate cost of notice and administration is $150,000-$160,000, which will be paid from the Settlement Fund. Agreement, ¶ 45; Siegel Decl., ¶ 35; Heffler Decl., ¶ 20.

The Claims Process to obtain Credit Monitoring Services or file a claim for Out-of-Pocket Losses and Attested Time is intended to be consumer friendly. Class members can submit claims by mail or online. The documentation necessary to establish Out-of-Pocket Losses and Attested Time can be uploaded through the settlement website or mailed in paper form. Heffler Decl., ¶ 4. The Claim Form provides examples of documentation that can establish various types

of losses. *See* Exhibit 2 to Agreement, Claim Form. Class members who elect to enroll in Credit Monitoring Services will receive an activation code by e-mail within 30 days of the Effective Date, or by mail if an e-mail address is not provided. Heffler Decl., ¶ 5. There is also a consumer-friendly appeals process whereby class members will have the opportunity to cure any deficiencies in their submission or request an appeal if the Settlement Administrator determines a claim for Out-of-Pocket Losses or Attested Time is deficient in whole or part. Siegel Decl., ¶ 23; Agreement, ¶¶ 51-52.

### D.   PROPOSED RELEASES

In exchange for the benefits provided under the Settlement, Settlement Class Members will release any claims that may arise from or relate to the facts and claims alleged in the Complaints filed in this litigation, as specified in paragraphs 89-90 of the Agreement. *See also* Siegel Decl., ¶ 34.

## IV.   ISSUING NOTICE TO THE CLASS IS JUSTIFIED.

### A.   STANDARD FOR ISSUANCE OF NOTICE

Under Rule 23(e)(1), as amended effective December 1, 2018, the Court must direct notice to the class of a class action settlement upon determining that giving notice is justified because the Court concludes it will likely be able to approve the settlement and certify the class for purposes of judgment on the settlement.

Rule 23(e)(2) provides that a proposed settlement may be approved only after a hearing and on a "finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983). Approval of a proposed settlement is committed to the sound discretion of the court. *See Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015). In determining whether a settlement is fair, reasonable, and adequate, the Court must consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

> (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

> (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

"Courts in the Fourth Circuit engage in a bifurcated analysis to determine if a settlement is 'fair, reasonable, and adequate' under Rule 23." *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 479 (D. Md. 2014). "To determine if the proposed terms are fair, the court should consider: (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of class action litigation." *Id.* (internal quotations omitted). "There is a 'strong presumption in favor of finding a settlement fair." *Id.* (internal quotation omitted). "To determine if the settlement is adequate, the Court considers: '(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.'" *Id.* (quoting *In re Jiffy Lube Sec.*

*Litig.*, 927 F.2d 155, 159 (4th Cir. 1991)).[8]

Plaintiffs ask that the Court conclude that issuing notice to the class is justified because it will likely find the settlement fair, reasonable, and adequate.

> **1.   The Class Representatives and Class Counsel Have Adequately Represented the Class.**

Plaintiffs' Counsel are highly experienced in litigating complex class actions, and are considered leaders in the field in data breach cases. Since the revelation of the Target data breach in late 2013, much of Plaintiffs' Counsel's practice has been dedicated to representing victims of data breaches. Mr. Siegel co-founded the American Association for Justice's Consumer Privacy and Data Breach Litigation Group and previously served as the group's co-chair. He is a nationally published author on emerging issues impacting data breach cases, and regularly speaks on data breach litigation issues. Plaintiffs' Counsels' experience in data breach and consumer privacy cases includes Mr. Siegel's appointment as a member of the executive committee in *In Re: Target Corporation Customer Data Security Breach Litigation*, No. 14-md-2522 (D. Minn.) (involving breach affecting tens of millions of customers), before the Hon. Paul A. Magnuson (D. Minn.), and as co-lead counsel for the consumer plaintiffs in *In Re: The Home Depot, Inc., Customer Data Security Breach Litigation*, No. 14-md-02583 (N.D. Ga.) (involving breach affecting more than 60 million customers). In the *Home Depot* litigation, Mr. Siegel served as the principal negotiator on behalf of the consumer class which resulted in a settlement that the presiding judge, the Honorable Thomas W. Thrash, referred to as an "exceptional result" and "the most comprehensive settlement achieved in large-scale data breach litigation." *In re The*

---

[8] The list of factors identified in the amended Rule 23(e)(2) is intended "not to displace" the factors identified in the federal courts for determining whether a settlement should be approved "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *See* Comments on the 2018 amendments to Fed. R. Civ. P. 23(e). Plaintiffs will address each of the factors identified by courts in the Fourth Circuit in the context of those provided in Rule 23(e)(2).

*Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 11299474, at *1 (N.D. Ga. Aug. 23, 2016). Siegel Decl., ¶ 3. In February 2018, Mr. Siegel was appointed as co-lead counsel in *In re Equifax, Inc. Customer Data Security Breach Litigation*, MDL No. 2800, 1:17-md-2800-TWT (Doc. 232), widely considered to be the most significant corporate data breach in U.S. history. In addition to other active cases, Stueve Siegel attorneys have also served as class counsel in smaller data breach cases including *Hapka v. CareCentrix*, Case No. 16-2372-CM-KGG (D. Kan.) (breach involving "spoofing" scam whereby employees' W-2s were sent to unauthorized party) and *Pagoaga v. Stephens Institute d/b/a Academy of Art University*, Case No. CGC 16-551952 (Superior Court of the State of California, County of San Francisco) (data breach involving W-2 information of thousands of employees). Siegel Decl., ¶ 4. Mr. Moore has worked closely with Mr. Siegel in each of these cases and has developed considerable expertise in this practice area. He has particular insight on the types of relief viewed as beneficial to victims of a data breach, having interviewed thousands of data breach victims over the last several years. The Settlement in this case was specifically structured to include the types of relief that data breach victims are most likely to find beneficial. *Id.*[9]

Here, Plaintiffs' Counsel provided extraordinary representation for the class. Because of their experience in the data breach field, numerous optometrists contacted the firm within weeks of the fraud starting seeking advice and representation. Counsel investigated the circumstances of each fraudulent event and developed the firm conviction that the source of the breach was NBEO. Because of the extreme nature of the fraud that was being perpetrated, Counsel believed it was important to address the matter quickly. When it became apparent that NBEO did not

---

[9] Ms. Mizrahi's counsel, Michael Liskow of The Sultzer Law Group, likewise has extensive experience litigating complex class actions on behalf of plaintiffs, including acting as co-lead counsel in the data breach class action *Bokelman v. FCH Industries, Inc.*, Civil No. 18-00209 RJB-RLP (D. Haw.) (final approval hearing for settlement scheduled May 2, 2019).

agree that its databases had been breached, Counsel prepared and filed a lawsuit, and attempted to immediately commence discovery and obtain the results of an investigation NBEO said it conducted. When the first complaint was dismissed for lack of Article III standing, Counsel successfully appealed that decision to the Fourth Circuit, and in the meantime, filed an additional lawsuit providing more factual details learned from Counsel's continued investigation.  Because class members are continuing to experience fraud resulting from the data breach, and because of the risk and delay associated with continued litigation (as discussed in greater detail below), Counsel believes the Settlement is in the best interests of the class. Plaintiffs' Counsel's experience litigating class actions, particularly in the data breach field, allowed them to fully understand the issues attendant to such litigation, and properly value the risks of continued litigation compared to benefits derived from the Settlement. Siegel Decl., ¶ 39. In addition, each of the substantive terms of the Settlement relating to relief to the class was negotiated prior to any discussion of the amount of an attorneys' fee award. *Id.* at ¶ 22.

Likewise, the proposed class representatives here (the 13 Named Plaintiffs) have proven their adequacy to represent the class. Each of them provided detailed information of the circumstances of the fraud they each experienced and their relationship with NBEO that was vital to Counsel's investigation and litigation of the class's claims. Furthermore, each of them has remained active in the case, communicating with Counsel during subsequent phases of the case, and, in particular, reviewing and approving the terms of the Settlement as being in the best interests of the class. *Id.* at ¶ 43. Thus, the adequacy of Plaintiffs' Counsel and the proposed class representatives supports a finding that the Court will likely approve the Settlement.

## 2.    The Settlement was Negotiated at Arm's Length.

Following the nearly 2-year extensive litigation on the issue of whether the Plaintiffs had stated a claim for relief and the appeal of whether they had sufficiently alleged standing, and

after Plaintiffs' Counsel's significant investigation into the merit of Plaintiffs' claims, on October 8, 2018, the Parties participated in a full-day mediation in Baltimore, Maryland before a mediator experienced in complex litigation, Cathy Yanni of JAMS ADR. Siegel Decl., ¶ 21. While the Parties were not able to reach an agreement at that session, they continued to engage in post-mediation settlement discussions through Ms. Yanni and directly between counsel, including negotiation of a Memorandum of Understanding containing the essential terms of a settlement. *Id.* During this period, the Parties exchanged preliminary discovery about the size and scope of the class, proposed business practices changes by NBEO, the merits of Plaintiffs' claims, and potential mechanisms to mitigate future harm, including evaluating multiple purveyors of credit monitoring services to determine the best product offering for the class. *Id.* On January 16, 2019, the Parties participated in a second in-person full-day mediation before Ms. Yanni in Chicago, this time agreeing to the essential terms of a settlement in principle, including accepting the mediator's proposal of the $3.25 million cash fund, memorialized by a Memorandum of Understanding. *Id.* And on February 28, 2019, the Parties entered into the Settlement that is now before this Court. *Id.* The circumstances surrounding the Parties' negotiations, including their reliance on a neutral mediator experienced in complex litigation, indicate the Settlement is fair, and that it should likely be approved. *See* Comment to December 2018 Amendment to Fed. R. Civ. P. 23(e) ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests.").

### 3.    The Relief Provided for the Class is More Than Adequate.

#### a.    The cost, risks, and delay of trial and appeal.

The costs, risks, and delay of trial and appeal weigh in favor of settlement approval. NBEO has lodged numerous arguments asserting that Plaintiffs cannot prove their claims in

whole and in part, including that their negligence claims are barred by the economic loss doctrine and fail because NBEO did not owe a duty to protect Plaintiffs' personal information, and that there is no enforceable contract between NBEO and their exam-takers to protect their personal information. *See, e.g.,* Doc. 11; *Liang*, Doc. 25-1. While the Court denied NBEO's motions to dismiss on these grounds, it indicated that the issues were substantial but were more appropriately resolved after discovery. *See* Doc. 31; *Liang*, Doc. 40. In addition, NBEO still maintains that it is not the source of the breached data, and this will continue to be a hotly contested issue that will require costly forensic investigation and expert testimony to establish through trial. Siegel Decl., ¶¶ 37-38.

Although Plaintiffs are confident in the merits of the class claims, the risks involved in prosecuting a class action through trial cannot be disregarded. Historically, data breach cases have faced substantial hurdles even in making it past the pleading stage. *See Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage). Class certification has been denied in other data breach cases. *See, e.g., In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013). While the law has gradually adapted to this relatively new type of litigation, the path to a class-wide monetary judgment remains untrodden, and it will take some time before litigants and courts navigate all the unique issues posed by data breach lawsuits and some level of certainty sets in—particularly in the area of damages. For now, data breach cases are best characterized as uncertain, making settlement the more prudent course when the parties are able to reach a resolution that addresses all the goals of the litigation. Siegel Decl., ¶¶ 36-39. Even if this case proceeded to trial, there is a risk that the class may not recover anything despite the high costs and delay of further discovery,

motion practice, trial, and appeal. For over two years, the Parties have fought hard and remained firm in their positions, and it is expected that continued litigation would be just as demanding. *Id.* at 38. Even if the class were to prevail at trial, NBEO is a modestly capitalized non-profit organization, and has established that it would have insufficient assets to satisfy a judgment in favor of the class following trial, leaving the class with nothing. *Id.* The risk to NBEO's solvency is a relevant consideration in evaluating the Settlement's adequacy, weighing in favor of approval. *See Decohen*, 299 F.R.D. at 480 ("[If] the defendant likely could not satisfy a litigated judgment, [the] settlement [is] the only means for claimants to recover at all.") (internal quotations omitted).

The delay attendant in continuing to litigate this case also favors approval of the Settlement. This litigation has been pending for two and a half years, and many more months and significant additional costs would be required for the Parties and the Court to complete the pre-trial proceedings, summary judgment, *Daubert* motions, and class certification. After trial, the Parties could appeal the Court's class certification and summary judgment decisions to the Fourth Circuit (and possibly beyond), which could take years to complete. Assuming the Parties went to trial and verdict, there would remain the possibility that the verdict could be reversed by this Court or on appeal.

By contrast, the proposed settlement agreement provides the class with substantial, guaranteed relief now. Settlement at this stage is especially warranted in the data breach context because class members benefit *immediately* from protections like Credit Monitoring Services and Identity Restoration Services that can help detect and prevent identity theft and fraud before misuse occurs, and assist class members in addressing any issues that arise, including by providing the protection of a $1 million insurance policy in case of identity theft or fraud. *See*

Siegel Decl., ¶ 36. Plaintiffs' Counsel insisted on a high-quality credit monitoring product that monitors all three of the major credit reporting agencies so that there are not major gaps in monitoring and identifying fraudulent activity. *Id.* at ¶ 30.

Thus, the cost, risks, and delay of trial and appeal supports a finding that this Court will likely approve the Settlement.

> **b.** **The effectiveness of the proposed method of distributing relief to the class, including the method of processing class member claims.**

The 61,014 class members are specifically identifiable through NBEO's records, and notice, with a simple and understandable claim form, will be directed to each one of them. The Settlement Administrator is tasked with reviewing and determining the validity of each submitted claim, and class members will be afforded the opportunity to correct any submission found to be deficient, and to appeal a claim denial. Agreement, ¶¶ 51-52. Class members whose claims are approved will receive checks in the mail within 30 days of the Effective Date of the Settlement. *Id.* at ¶ 55. This process will ensure that all class members have the opportunity to seek relief under the Settlement, will have their claims assessed fairly, and will receive benefits in a timely manner. This factor supports a finding that the Settlement will likely be approved.

> **c.** **The terms of the proposed attorneys' fee award and reimbursement of expenses, including the timing of payment.**

Class Counsel[10] will seek their fee as a percentage of the $3,250,000 Settlement Fund created for the class. NBEO has agreed not to oppose any fee request that is not more than thirty percent of the fund. Class Counsel will file their fee motion at least 21 days before the Objection Deadline so that class members will have the opportunity to present their views on the fee

---

[10] Class Counsel is defined in the Settlement Agreement as Norman E. Siegel and Austin Moore of Stueve Siegel Hanson LLP. Agreement, ¶ 7. As part of this motion, Mr. Siegel and Mr. Moore move to be appointed as interim Class Counsel pending the certification of the Settlement Class at Final Approval, where they will move to be appointed Class Counsel. *See* Part V, *infra*.

request. Agreement, ¶ 98; Siegel Decl., ¶ 43. The Agreement's provision for an attorneys' fee award from the Settlement Fund is fair. *See, e.g., Jernigan v. Protas, Spivok & Collins, LLC*, No. CV ELH-16-03058, 2017 WL 4176217, at *2 (D. Md. Sept. 20, 2017) ("The United States Supreme Court has said that the 'common-fund doctrine' entitles 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client ... to a reasonable attorney's fee from *the fund as a whole.*'") (emphasis in original) (quoting *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 96 (2013)); *see also* Fed. R. Civ. P. 23(h) (permitting the court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement").

In addition, the Agreement's provision for an award of up to thirty percent of the fund is reasonable. First, district courts in the Fourth Circuit prefer the percentage-of-the-fund method for determining a reasonable fee when a common fund is obtained for the class. *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 462 (D. Md. 2014); *Jones v. Dominion Res. Servs.*, Inc., 601 F. Supp. 2d 756, 758-59 (S.D.W. Va. 2009) ("[O]verwhelmingly, courts prefer the percentage method."). "Attorneys' fees awarded under [this] method are generally between twenty-five (25) percent and thirty (30) percent of the fund." *Boyd*, 299 F.R.D. at 464 (citing Manual for Complex Litigation, § 14.121). An award in the higher end of that range is more likely to be approved when the fund is relatively small. *Boyd*, 299 F.R.D. at 464-65. Accordingly, the Agreement's provision for an award of up to thirty percent of the fund is within the range generally deemed reasonable.[11]

---

[11] Courts in this circuit analyze the following factors when determining whether to approve an award based on a particular percentage of the fund: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy. *Boyd*, 299

Second, courts within this circuit generally supplement the percentage method with the lodestar cross-check. *Id.* at 462; *see also In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 261 (E.D. Va. 2009). On a lodestar cross-check, multipliers of between 2 and 4.5 are generally deemed reasonable. *Id.* at 467. In this case, if Class Counsel ultimately seeks the full thirty percent, this will result in a fee of $975,000. Class Counsel's present lodestar is approximately $875,000, and counsel for *Mizrahi* has reported additional lodestar of over $150,000, bringing the total lodestar to approximately $1 million, or a lodestar multiplier less than 1. This ratio will continue to decrease, taking into account Class Counsel's future work overseeing administration of the Settlement, communicating with class members, preparing and arguing the motion for final approval, handling any possible appeals, and overseeing claims distribution during a multi-year claims period. Plaintiffs' Counsel has also incurred costs and expenses to date in excess of $50,000, and will likely expend an additional $5,000 to $10,000 in costs and expenses through final approval. Siegel Decl., ¶ 42.

Class Counsel will provide a more thorough analysis of the reasonableness of their forthcoming attorneys' fee and expense award request in the fee motion. But importantly, the Parties' Agreement is not conditioned upon the Court's approval of the fee award. Agreement, ¶ 100. Accordingly, at this stage, the Court can and should conclude that it is likely to approve the Settlement for purposes of sending notice to the class, even if it has not yet concluded whether and in what amount it would award attorneys' fees and expenses.[12]

---

F.R.D. at 462. "[F]ee award reasonableness factors need not be applied in a formulaic way because each case is different, and in certain cases, one factor may outweigh the rest." *Id.* (internal quotations omitted). Class Counsel will address each of these factors in their fee motion.

[12] Similarly, Class Counsel will request service awards of $2,000 each for each named plaintiff in their forthcoming motion. Service awards of this size are generally deemed reasonable. *See Decohen*, 299 F.R.D. at 483; *Boyd*, 299 F.R.D. at 469; *Singleton v. Domino's Pizza, LLC*, 976 F.

      **d.**      **There is no agreement required to be identified under Rule 23(e)(3).**

Under Rule 23(e)(3), "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." There is no agreement between the Parties here, except those set forth in the Settlement Agreement. Accordingly, this factor is not relevant to whether the Settlement is likely to be approved.

      **4.**      **The Settlement Treats Class Members Equitably Relative to Each Other.**

The Settlement treats all class members identically. Every class member has the opportunity to claim benefits under the Settlement in relation to the harm they have suffered, including prospective protection for future harm. The named plaintiffs, likewise, will be entitled to the same opportunities as the rest of the class, with the addition of the modest service awards Class Counsel will seek on their behalf for their important and necessary contribution to this litigation. This factor supports a finding that the Settlement will likely be approved.

**B.**      **THE SETTLEMENT CLASS MEETS THE REQUIREMENTS FOR CERTIFICATION FOR PURPOSES OF SETTLEMENT.**

The second requirement in Rule 23(e)(1) for issuance of notice to the class is a finding that the Court will "likely be able to . . . certify the class for purposes of judgment" on the proposed settlement. Here, the Settlement Class meets the requirements for certification under Rule 23(b)(3), so the Court should conclude that issuing notice is justified.

To certify a class under Federal Rule of Civil Procedure 23, the class must meet the four prerequisites in Rule 23(a) and satisfy at least one of the three Rule 23(b) categories. *Decohen*, 299 F.R.D. at 476 (citing *Boyd*, 299 F.R.D. at 457-58). Plaintiffs seek certification under Rule 23(b)(3). When class certification is sought for purposes of settlement under Rule 23(b)(3), the

---

Supp. 2d 665, 691 (D. Md. 2013). In addition, the Parties' Agreement is not conditioned on the Court's approval of this request. Agreement, ¶ 97.

"'district court need not inquire whether the case, if tried, would present intractable management problems'" under Rule 23(b)(3)(D), however, the other Rule 23 requirements must be satisfied. *Id.* at 476-77 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). "District courts have wide discretion in deciding whether to certify a class and should liberally construe Rule 23." *Chado v. Nat'l Auto Inspections. LLC*, No. CV ADC-17-2945, 2018 WL 3420018, at *3 (D. Md. July 13, 2018) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)). In this case, the Settlement Class meets each of the requirements for class certification.

### 1. Rule 23(a) is satisfied.

Rule 23(a) provides the following prerequisites for class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The Settlement Class satisfies each of these requirements.

### a. Numerosity is satisfied.

The class includes 61,014 persons. Where "classes with as few as 25 to 30 members 'have been found to raise the presumption that joinder would be impracticable,'" *Decohen*, 299 F.R.D. at 477, the numerosity requirement is easily satisfied here. In addition, joinder is also impracticable because the class members are widely dispersed geographically and unlikely to institute their own actions given the relatively small size of each individual claim. *See* 1 Newberg on Class Actions § 3:12 (5th ed.).

### b. Commonality, Typicality, and Adequacy are satisfied.

"The commonality, typicality, and adequacy inquiries are similar and overlapping." *Decohen*, 299 F.R.D. at 477 (internal quotations omitted). To establish commonality, the

"plaintiffs must present a common contention capable of being proven or disproven in 'one stroke,'" the answer to which will "drive the litigation." *Brown v. Nucor Corp.*, 785 F.3d 895, 909 (4th Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)). Where class members share the same legal theory, some factual differences among class members will not preclude certification. *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 770 (D. Md. 2012). "[T]he typicality requirement ensures that the claims of the class representative are sufficiently aligned with those of the other class members. Typicality is satisfied when the plaintiffs and the class have an interest in prevailing on similar legal claims." *Chado v. Nat'l Auto Inspections. LLC*, No. CV ADC-17-2945, 2018 WL 3420018, at *6 (D. Md. July 13, 2018). Representation is adequate if the representative plaintiff's interests are not opposed to the interests of the other class members, and class counsel are qualified, experienced, and able to conduct the litigation. *Id.*

Each of these requirements is satisfied in this case. Each plaintiff alleges their personal information, and that of the class they seek to represent, was compromised in an alleged breach of NBEO's databases that occurred in or about the summer of 2016. Many class members experienced credit card and other forms of fraud using that same personal information shortly thereafter, and any that did not suffer immediate fraud had reason to attempt to protect themselves from such harm. *See Hutton*, 892 F.3d at 621-22. Each class member alleges NBEO had an obligation to protect their personal information and that it failed to do so. Accordingly, each class member has suffered the same alleged harm in the misappropriation of their personal information by fraudsters aimed at exploiting it. The common questions include, but are not limited to, whether NBEO's data systems were breached, and if so, whether NBEO failed to act reasonably in preventing that breach. Accordingly, commonality is satisfied, the named

30

plaintiffs' claims are typical of those of the settlement class members, and their interests are aligned, satisfying the adequacy requirement. *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 308-10 (N.D. Cal. 2018) (finding commonality, typicality, and adequacy were satisfied where all class members' claims related to a breach of the same defendant's data systems that resulted in the compromise of their personal information); *Hapka v. CareCentrix, Inc.*, No. 2:16-CV-02372-KGG, 2018 WL 1871449, at *2 (D. Kan. Feb. 15, 2018) (same); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1053-57 (S.D. Tex. 2012) (same).

In addition, Class Counsel are qualified to represent the Settlement Class. As discussed above, they have extensive experience in prosecuting data breach cases, having represented data breach victims in numerous cases across the country, including ones against Target, Home Depot, and Equifax, often in a leadership role. In this case, they have spent considerable time investigating class members' injuries and the claims in this case, and briefing extensively their clients' rights to litigate this case both before this Court and the Fourth Circuit Court of Appeals. Accordingly, the Rule 23(a) prerequisites have been met.

### 2.      Rule 23(b)(3) is satisfied.

Rule 23(b)(3) authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The predominance inquiry "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 447 (D. Md. 2018) (quoting *Amchem*, 521 U.S. at 623-24). "Certification under Rule 23(b)(3) is appropriate when settling the parties differences in a single proceeding serves their

interests by achieving economies of time, effort, and expense and promoting uniformity of decisions as to similarly situated class members without sacrificing fairness." *Decohen*, 299 F.R.D. at 478 (internal quotations omitted).

### a.    Predominance is satisfied.

In this case, the key predominating questions are whether NBEO suffered a data breach in or about the summer of 2016, and if so, whether it was using reasonable data security measures to protect Plaintiffs' personal information. The answers to these questions would be the foundational elements to determine NBEO's liability and drive the litigation. Accordingly, predominance is satisfied. *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. at 312-315 (finding predominance was satisfied because "Plaintiffs' case for liability depend[ed], first and foremost, on whether [the defendant] used reasonable data security to protect Plaintiffs' personal information," such that "the claims rise or fall on whether [the defendant] properly secured the stolen personal information," and that these issues predominated over "potential individual issues based on state-law variations"); *Hapka*, 2018 WL 1871449, at *2 (finding predominance was satisfied in a data breach case, stating "[t]he many common questions of fact and law that arise from the E-mail Security Incident and CareCentrix's alleged conduct predominate over any individualized issues"); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *2 (finding common predominating questions included whether Home Depot failed to reasonably protect class members' personal and financial information, whether it had a legal duty to do so, and whether it failed to timely notify class members of the data breach); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d at 1059 (finding predominance satisfied in data breach case despite variations in state laws at issue because such variations were inapplicable for settlement class).

**b.      Superiority is satisfied.**

To determine if superiority requirements are met for certification of a settlement class, courts consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum. *See* Rule 23(b)(3); *Decohen*, 299 F.R.D. at 478. Proceeding as a class action in this case is superior to other means of adjudication. There is no indication in this case that any class member wishes to litigate their claims individually, and there are no other cases that have been filed. And with the high cost of litigating a case like this—requiring expert investigation and testimony to prove the data breach occurred—almost certainly swamping individual damages, individualized litigation is impracticable. *See In re Serzone Prod. Liab. Litig.*, 231 F.R.D. 221, 240-41 (S.D.W. Va. 2005) ("Class actions are often the only means for assuring that defendants who have harmed consumers will not benefit from their unlawful conduct simply because of the magnitude of the misconduct and aggregated harm compared to the small magnitude of individual harm."). Finally, this Court is a desirable forum for this litigation. It is where each of the three consolidated cases was filed, and NBEO is incorporated here. Accordingly, resolution of this case through class action settlement in this Court will achieve significant economies for the Parties, the proposed settlement class, and the Court, satisfying the superiority requirement.

Accordingly, because the Settlement Class satisfies the requirements of Rule 23(a) and (b)(3), the Court should conclude that it will likely be able to certify the class for purposes of judgment on the Settlement. And because the Settlement is fair, reasonable, and adequate, such that the Court should conclude it will likely approve the Settlement, the Court should permit the issuance of notice to the class.

## V.   THE COURT SHOULD APPOINT NORMAN E. SIEGEL AND AUSTIN MOORE OF STUEVE SIEGEL HANSON LLP AS INTERIM CLASS COUNSEL.

Federal Rule of Civil Procedure 23(g) provides that in appointing class counsel, the Court considers (i) counsel's work in identifying or investigating claims; (ii) counsel's experience in handling the types of claims asserted; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). Plaintiffs' counsel Norman E. Siegel and Austin Moore of Stueve Siegel Hanson LLP readily meet those considerations in this case and should be appointed as interim Class Counsel pursuant to Rule 23(g)(3) pending certification of the class at Final Approval, for purposes of the dissemination of notice to the class. *See* Siegel Decl. ¶ 41.

## VI.   THE NOTICE SATISFIES RULE 23 AND DUE PROCESS REQUIREMENTS.

Under Rule 23(e)(1)(B), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a [settlement] proposal." Likewise, in directing notice "to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)--the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2)(B). "The content of the notice must sufficiently inform class members of the terms of the proposed settlements and their available options." *Decohen*, 299 F.R.D. at 478.

The proposed Notice (Exhibit 1 to the Settlement Agreement) readily meets these requirements, and the notice program, using multiple modes of direct delivery (mail and email), constitutes the best practicable notice under the circumstances of this case. *See* Heffler Decl., ¶ 3. The Notice uses "plain English" to inform class members of, among other things, the nature of the class claims, the essential terms of the Settlement, the date, time and place of the Final Approval Hearing, how to object or opt-out of the Settlement, and the binding effect of the

Settlement on class members. The Notice also contains information regarding Class Counsel's request for fees and expenses, and the proposed service awards to the class representatives. Thus, the notice satisfies the specific requirements of Federal Rule of Civil Procedure 23(c)(2)(B), informs class members of the terms of the proposed settlement and their available options, is the best notice that is practicable under the circumstances, and should be approved by the Court.

## VII.   THE COURT SHOULD APPOINT HEFFLER CLAIMS GROUP AS SETTLEMENT ADMINISTRATOR.

Plaintiffs also request that the Court appoint Heffler Claims Group to serve as Settlement Administrator. Heffler is well-versed in administering class action settlements, including in the data breach context, *see generally* Heffler Decl., and is willing, able, and prepared to fulfill the role of Settlement Administrator in this case.

## VIII.   PROPOSED TIMELINE OF EVENTS

In connection with its determination on whether it is likely to approve the Settlement, the Court must set a final approval hearing date; dates for notice; deadlines for objecting or opting-out of the Settlement, and a schedule for further court submissions, among other items. The Parties propose the schedule set forth in Appendix A hereto, which is keyed off of the date of the order permitting the issuance of notice.

## IX.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the Proposed Order at Exhibit E permitting issuance of notice of the proposed settlement, appointing Norman E. Siegel and Austin Moore of Stueve Siegel Hanson LLP as interim Class Counsel, directing dissemination of the Class Notice, appointing Heffler Claims Group as Settlement Administrator, and setting a hearing for the purpose of deciding whether to grant final approval of the settlement.

Dated:  March 4, 2019

Respectfully submitted,

By:    s/ Norman E. Siegel

Norman E. Siegel (*pro hac vice*)
Barrett J. Vahle (*pro hac vice*)
J. Austin Moore (*pro hac vice*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City MO 64112
siegel@stuevesiegel.com
vahle@stuevesiegel.com
moore@stuevesiegel.com
Tel:    (816) 714-7100
Fax:    (816) 714-7101

Michael Liskow (*pro hac vice*)
The Sultzer Law Group P.C.
351 W. 54th St., Suite 1C
New York, New York 10019
liskowm@thesultzerlawgroup.com
Telephone: (212) 969-7811
Fax: (888) 749-7747

Hassan Zavareei (No. 18489)
TYCKO & ZAVAREEI LLP
1828 L. Street, NW, Suite 1000
Washington, DC 20036
hzavareei@tzlegal.com
Tel: (202) 973-0910
Fax: (202) 973-0950
*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2019, I filed the foregoing document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

/s/ Norman E. Siegel
Counsel for Plaintiff

**APPENDIX A**

| EVENT | TIMING |
|---|---|
| Deadline for NBEO to disseminate CAFA notices | March 14, 2019 |
| Deadline for NBEO to provide the Settlement Administrator each Settlement Class Members' name, address, and e-mail information set forth in paragraph 34 of the Settlement Agreement | [3 days after order permitting issuance of notice] |
| Deadline for the Settlement Administrator to mail Court-approved Notice to Settlement Class | [21 days after order permitting issuance of notice] |
| Notice deadline | [30 days after order permitting issuance of notice] |
| Deadline to file Class Counsel's motion for attorneys' fees, costs, expenses and service awards | [21 days before objection and opt-out deadline] |
| Deadline for Class Counsel to file motion for final approval of settlement and responses to any timely submitted Class member objections | [21 days prior to final settlement approval hearing] |
| Objection deadline | [30 days after notice deadline] |
| Opt-out deadline | [30 days after notice deadline] |
| Claims deadline | [90 days after notice deadline] |
| Tail deadline (period during which Class Members can make claims for Out-of-Pocket Losses incurred after Claims Deadline if certain conditions are met) | [183 days after claims deadline] |
| Final approval hearing | [At least 120 days after order permitting issuance of notice] |